GALLIAN, WILCOX,
WELKER, OLSON & BECKSTROM, L.C.
Jeffrey C. Wilcox (4441)
jwilcox@gwwo.com
John L Collins (10790)
jcollins@gwwo.com
965 East 700 South, Suite 305
St. George, Utah 84790
Telephone: (435) 628-1682

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RON THAYER and CATHIE THAYER,<br><br>Plaintiffs,<br><br>vs.<br><br>WASHINGTON COUNTY SCHOOL DISTRICT, CITY OF ST. GEORGE, ROBERT GOULDING, MICHAEL EATON, STACY RICHAN, DAVID AMODT, JOHN and JANE DOES I–X, ABC CORPORATIONS I–X, and XYZ PARTNERSHIPS I–X,<br><br>Defendants. | **COMPLAINT**<br><br>JURY DEMANDED<br><br><br><br><br><br>Civil No. 2:09-cv-565<br><br>Judge Dee Benson |

Plaintiffs Ron Thayer and Cathie Thayer (collectively "the Thayers"), by and through the

law offices of GALLIAN, WILCOX, WELKER, OLSON & BECKSTROM, L.C., for their Complaint

against Defendants aver as follows:

//

//

## JURISDICTION AND VENUE

1. Plaintiffs Ron and Cathie Thayer are the parents and survivors of Tucker Thayer ("Tucker"), who is now deceased. The Thayers are residents of Washington County, Utah, as was Tucker prior to his death.

2. On information and belief, Defendant Washington County School District ("District") is a political subdivision of the State of Utah, operating in Washington County, Utah, and is subject to the jurisdiction of this Court.

3. On information and belief, Defendant City of St. George ("St. George") is a political subdivision of the State of Utah, operating in Washington County, Utah, and is subject to the jurisdiction of this Court.

4. On information and belief, Defendant Robert Goulding ("Mr. Goulding") is a resident and domiciliary of Washington County, Utah, and is subject to the jurisdiction of this Court.

5. On information and belief, Defendant Michael Eaton ("Mr. Eaton") is a resident and domiciliary of Washington County, Utah, and is subject to the jurisdiction of this Court.

6. On information and belief, Defendant Stacy Richan ("SRO Richan") is a resident and domiciliary of Washington County, Utah, and is subject to the jurisdiction of this Court.

7. On information and belief, Defendant David Amodt ("Mr. Amodt") is a resident and domiciliary of Washington County, Utah, and is subject to the jurisdiction of this Court.

8. The conduct complained of herein occurred in Washington County, Utah.

9. This action arises under a federal statute, to wit, 42 U.S.C. § 1983 (2009). As such, jurisdiction in this Court is proper and is predicated on 28 U.S.C. § 1331.

10. Venue in this Court is proper and is predicated on 28 U.S.C. § 1391(b)(1)–(2).

11. The Thayers are entitled to have this matter tried to a jury, and they hereby demand the same.

## GENERAL FACTUAL ALLEGATIONS

12. Ron and Cathie Thayer are the parents of Tucker Thayer, a fifteen-year-old child who was shot and killed with a handgun loaded with blanks on November 15, 2008, at his school, Desert Hills High School ("Desert Hills").

13. However, unlike other tragic shootings that have occurred at other schools in the past, the handgun that killed Tucker Thayer was at the school with the approval and support of the school's employees and administration as well as the local police department.

14. Desert Hills is a secondary school owned and operated by Defendant District in St. George, Utah.

15. The District opened Desert Hills for the 2008 school year, giving Tucker the opportunity to attend high school in his own neighborhood, near his home.

16. Tucker was an energetic and creative boy, and in order to develop his talents and abilities, Tucker became involved with the theater program at Desert Hills.

17. Mr. Eaton was Tucker's theater teacher and an employee of the District.

18. When the school and theater program took on the ambitious project to produce the Rogers and Hammerstein classic musical "Oklahoma" during the fall of 2008, Tucker was excited to participate as a stage tech under the direction of Mr. Eaton.

19. Possibly to give the production a sense of realism and drama, Mr. Eaton decided to use a real handgun in the play, but not as an on-stage prop. Mr. Eaton wanted to actually fire a handgun, loaded with a blank round, in the theater as a sound effect.

20. However, state law and Defendant District's policies prohibit the possession of dangerous weapons on the campus of any public school. Therefore, before following through with his plan, Mr. Eaton consulted with the in-house representative of the St. George Police Department, School Resource Officer Stacy Richan.

21. The St. George Police Department ("SGPD") is a political subdivision wholly controlled and operated by Defendant St. George.

22. Apparently believing that the handgun Mr. Eaton was proposing to use for the play was capable of only firing blanks, SRO Richan approved the use of the handgun on school property as long as an adult brought the weapon to school for rehearsals and performances; the weapon remained under the adult's control and in a locked container until it was to be used; and the weapon was only to be fired by the adult.

23. SRO Richan never asked to inspect the weapon prior to giving his approval.

24. The gun Mr. Eaton decided to use for the performance belongs to Mr. Amodt, whose daughter was the student stage manager of "Oklahoma."

25. The weapon was a Smith & Wesson .38 caliber, six-shot revolver capable of being fired either by a single action trigger pull or by a double action trigger pull, and was fully capable of firing live .38 caliber ammunition rounds; not just blanks as was supposed by SRO Richan.

26. In addition, the weapon had been altered from its factory specifications to give it a "hair trigger," reducing by half the amount of force required to pull the trigger, whether a single or double action trigger pull.

//

4

27. The modifications of the gun caused it to sometimes jam when the double action trigger pull was used to fire the gun.

28. The only way to reliably fire the gun without it jamming was to cock the hammer and engage the single trigger pull.

29. With the trigger thus cocked, the only thing preventing the gun from firing was the modified single action hair trigger.

30. Mr. Goulding also knew about and consented to the use of Mr. Amodt's dangerous weapon on school grounds.

31. After Mr. Eaton spoke to SRO Richan regarding using Mr. Amodt's gun during the play, SRO Richan approached Mr. Goulding and told him about his (SRO Richan's) conversation with Mr. Eaton. SRO Richan told Mr. Goulding that he (SRO Richan) had authorized the gun to be used during the play and told Mr. Goulding the rules he had imposed for the use of the gun.

32. Mr. Goulding agreed with SRO Richan and authorized the use of the gun during the play, so long as SRO Richan saw that the rules were followed.

33. SRO Richan also told Mr. Goulding that he had spoken to superiors at SGPD regarding the use of the gun during the play.

34. Mr. Amodt's wife also spoke with Mr. Goulding on or about November 5, 2008, in order to make sure that the school would not be placed in "lockdown" based on the presence of the gun on school property.

//

//

35. In response to Mrs. Amodt's questions, Mr. Goulding, on behalf of the District, authorized the use of the weapon for the production of "Oklahoma" under the conditions imposed by SRO Richan.

36. Like SRO Richan, Mr. Goulding did not inspect the weapon prior to approving its use on school property.

37. Neither SRO Richan, nor Mr. Goulding, nor Mr. Eaton ever required the cast of "Oklahoma" to participate in safety training with regards to the handgun.

38. Upon information and belief, no one from the District or SGPD discussed with the "Oklahoma" cast members the dangers of using the firearm; nobody from the District or SGPD taught the students the dangers associated with the blanks that would fired from the gun; nobody from the District or SGPD told the cast members that it was illegal for children under eighteen years old to possess or use handguns; nobody from the District or SGPD explained to the students the rules regarding how the handgun would be brought to and from school; nobody from the District or SGPD explained to the students where the gun was to be stored; and nobody from the District or SGPD informed the students that only Mr. Amodt was to use and shoot the gun.

39. Furthermore, SRO Richan, Mr. Goulding, and Mr. Eaton never informed the parents of the students involved in the play that a "dangerous weapon," as defined by Utah Code Ann. § 76-10-501(5) (2009), was going to be used in the play.

40. No one from the District and/or SGPD obtained written permission from the students' parents authorizing their children to be involved in the play when a dangerous weapon would be part of the production.

//

6

41. The Thayers never gave permission to the school to allow Tucker to possess, handle and/or shoot the weapon during the rehearsals and/or the performances of the play.

42. SRO Richan, Mr. Goulding, Mr. Eaton and Mr. Amodt each failed to implement and enforce the rules SRO Richan set forth governing the use of the dangerous weapon.

43. Instead of having an adult bring the gun to school, Mr. Amodt often entrusted his minor daughter with the responsibility of carrying the weapon to school in her backpack.

44. Instead of having constant adult supervision over the weapon, it was left, in its lock box, unattended in the sound booth. Indeed, Mr. Eaton later acknowledged that the gun was simply "brought in and kept in [Mr. Amodt's daughter's] backpack under the soundboard."

45. Instead of having constant adult supervision and control over the "blanks" that were to be fired in the gun, blank rounds were also left in the sound booth, unattended, before each rehearsal and/or performance.

46. Instead of having an adult shoot the gun, Tucker was allowed to shoot the gun during the last two weeks of rehearsals leading to the opening of the play and during each of the performances of the play.

47. Mr. Amodt allowed Tucker to shoot the gun during rehearsals and performances because Tucker knew the play and knew when to shoot the gun.

48. Even though Mr. Amodt had, on occasion, warned Tucker to stop messing around with the gun until the proper scene, he continued to allow Tucker to shoot the gun during rehearsals and performances of the play.

49. During most of the time that Tucker fired the handgun during rehearsals and/or performances, he did so without adult supervision and, indeed, with no adult present.

50. Tucker was under the impression that shooting the gun was his "job." In an interview Tucker gave the day before his death, he said that his "job basically is to run the spotlight and shoot the gun during all of the major shooting scenes."

51. Tucker had control of the weapon, and even played with the gun and its "blanks," without any adult supervision during both rehearsals and performances.

52. Students saw Tucker point the gun at other students and even at himself, pretending to shoot in a joking and kidding manner.

53. Indeed, Tucker had complete control and access of the weapon at almost all times during rehearsals and performances. He knew the combination of the lock box in which the gun was brought to school.

54. He was once observed by students removing the gun from the lock box, handing it to another student to see and hold, then taking the gun back and returning it to the lock box.

55. Mr. Eaton and Mr. Amodt each knew that Tucker had access to and control of the gun and had been firing the weapon during rehearsals and performances, but they took no action to stop him from hurting himself or anyone else.

56. Indeed, Mr. Eaton encouraged Tucker's use of the weapon. In at least one instance when the gun was fired on cue, Mr. Eaton told the stage manager, by two-way radio, "That was great! [Mr. Amodt] is my new best friend!" The stage manager replied by radio, "That was Tucker." Mr. Eaton responded, "Tell him he is my new favorite student."

57. Even prior to the play, it was apparent that the weapon had not been used in a responsible manner. Specifically, on at least one occasion during rehearsals the cue to fire the gun was missed. Later, the blank was fired unexpectedly in a different scene, which caused the

actor playing the role of "Judd" to flinch while he was supposed to be dead, evoking laughter from cast members.

58. No adult ever followed up to see why the cue had been missed, who missed the cue, and why the gun was fired later, at an inappropriate time.

59. Instead, the gun and ammunition continued to be left at the school during rehearsals and performances in Tucker's control and without adult supervision.

60. A few days prior to November 15, 2008, the gun with three blanks was brought to the school, but the stage manager reported that the three blanks were missing. Mr. Amodt then brought three additional blanks to the play so the gun could be fired.

61. No adult followed up to investigate what happened to the missing blanks.

62. On November 15, 2008. The gun and three blanks were left in the sound booth without any adult supervision.

63. After overhearing a conversation between Tucker and another student in the sound booth, an adult became concerned that Tucker might be planning a practical joke with the gun, such as firing the weapon at an inappropriate point in the play. However, nothing was said to Tucker, and the gun was left in the sound booth without adult supervision.

64. Soon thereafter, the gun was discharged near Tucker's head.

65. No adult was present in the sound booth when the gun discharged.

66. At the time Tucker was shot, Mr. Amodt was in the "green room" (Mr. Eaton's office) showing student actors images of prior performances.

67. Mr. Eaton was also not in the sound booth at the time Tucker was shot. Instead, he was near or on the stage preparing for that night's performance.

68. Despite not having a bullet, the muzzle blast from the live blank drove skull fragments into Tucker's brain.

69. In addition, a "blowback" wound of approximately three inches in diameter was formed as the result of gases produced by the explosion of the gun powder exiting from the same hole they entered after being driven into Tucker's brain.

70. Tucker died later that night.

71. In circumstances other than Tucker's tragic death, the District has strict guidelines and prohibitions related to the presence of dangerous weapons, including handguns, on school property.

72. The District's "Safe Schools Policy" imposes mandatory suspension or expulsion for any student who has "possession, control, or actual or threatened use of a real weapon, explosive, or noxious or flammable material" or who makes any "actual or threatened use of a look alike weapon" on school property or at school activities.

73. The District and the SGPD have, at times, taken the threat of weapons at Desert Hills very seriously. For instance, on October 10, 2008—only one month before his death—Tucker, with the approval of Mr. Eaton, took a broken prop rifle home so that he and his father could repair the prop. When he returned the repaired prop rifle to the school, someone apparently saw him carrying the prop rifle onto school grounds, became worried, and contacted police.

74. Desert Hills, and three other nearby schools, were "locked down" based on the apparent threat of a weapon on school grounds, and a police SWAT team took Tucker from his classroom at gunpoint, when he had to explain what he had been doing with the prop rifle.

//

75. Upon information and belief, Mr. Eaton later stated that the lockdown incident was good publicity for the upcoming production of "Oklahoma."

76. However, the rules and procedures that had been established and implemented to protect Desert Hills' students from the real, malfunctioning gun used in the play were not enforced when the District and the SGPD allowed the use of this deadly weapon to be used on school grounds for no better reason than its use as a sound effect.

77. As the direct and proximate result of Defendants' conduct, the Thayers have incurred costs and expenses related to the efforts of physicians, nurses, and other health care providers to save Tucker's life, costs and expenses related to Tucker's burial, and other general damages, for which they are entitled to recover.

78. As the direct and proximate result of Defendants' conduct, the Thayers have incurred damages, including, without limitation, damages for pain, suffering, loss of Tucker's time and earnings, loss of Tucker's support, loss of Tucker's assistance and service to the family, and loss of Tucker's society, companionship, and happiness of associations, each of which the Thayers claim as an element of special damages, for which they are entitled to recover.

79. On information and belief, Mr. Eaton and Mr. Goulding are each agents or employees of Defendant District.

80. On information and belief, all conduct of Mr. Eaton and Mr. Goulding complained of herein was performed in the scope of their respective employment for Defendant District.

81. On information and belief, SRO Richan is an officer, agent, or employee of Defendant District and/or SGPD, which is a department of Defendant St. George.

//

82. On information and belief, all conduct of SRO Richan complained of herein was performed in the scope of his employment for Defendant District and/or SGPD, which is a department of Defendant St. George.

83. Defendants' conduct manifests and knowing and reckless indifference toward, and a disregard of, the rights of others, including Tucker and his parents.

84. Pursuant to the Governmental Immunity Act of Utah, Utah Code Ann. §§ 63G-7-101 to -904 (2009), and in compliance with its requirements, the Thayers mailed to Defendant District and to Defendant St. George a separate Notice of Claim for Injury on March 24, 2009.

### FIRST CAUSE OF ACTION
*Depravation of Rights (42 U.S.C. § 1983)—Against Defendants District, SGPD, Messrs. Goulding and Eaton, and SRO Richan*

85. The Thayers reassert all other allegations contained in this Complaint and incorporate them herein as if set forth in full.

86. Defendants District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan each had a special relationship to Tucker by virtue of their custody over Tucker while he was in attendance at school activities, including rehearsals and performances of the play.

87. Moreover, and without limitation, by storing a dangerous weapon in a place where minors had easy access to the weapon, by failing to train the minors involved with the play about safe practices for being around the handgun and the policies and procedures instituted by the District and by St. George, through SGPD, for use of the weapon for the play, by entrusting Tucker with the possession and use of the dangerous weapon during the play, by failing to supervise Tucker while he was in control of the dangerous weapon, and by failing to implement or enforce the statutes, policies, and procedures that had been adopted regarding the use of such

dangerous weapons by minors, and specifically with respect to the use of the hand gun in the play, Defendants District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan created the danger that ultimately killed Tucker.

88. Because these defendants created the danger to Tucker's safety and physical integrity, each of these defendants owed a duty to Tucker and to the Thayers to keep Tucker safe from physical harm.

89. The District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan engaged in reckless conduct in such a manner that they each acted with the intent to place Tucker, and other Desert Hills students, faculty, staff, and theater-goers unreasonably at risk.

90. The District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan were aware of a known or obvious risk that was so great that it was highly probably that serious harm would follow, and each defendant proceeded in conscious and unreasonable disregard of the consequences to an extent that their conduct shocks the conscience.

91. Tucker was a member of a limited and specifically definable group, to wit, the Desert Hills student body.

92. The conduct of the District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan put Tucker and the other members of that group at substantial risk of serious, immediate and proximate harm.

93. The risk of harm was known by or was obvious to the District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan.

94. The District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan acted recklessly in conscious disregard of those risks.

13

95. The conduct of the District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan, when viewed in totality, is conscience shocking.

96. The District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan engaged in their conduct under color of statutes, ordinances, regulations, customs, or usages, of the State of Utah and its municipalities and subdivisions.

97. Under the color of law, the District, St. George, through SGPD, Mr. Goulding, Mr. Eaton, and SRO Richan deprived Tucker and the Thayers of their rights, privileges, or immunities secured by the Constitution and laws.

98. As the direct and proximate result of the above-named Defendants' conduct, Tucker was killed, and the Thayers have suffered damages for which they are entitled to recover.

## SECOND CAUSE OF ACTION
### Wrongful Death—Against All Defendants

99. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

100. Each of the defendants knew or should have known of the likely danger to Tucker, and to other students of Desert Hills or patrons attending a performance of the play, associated with giving a fifteen year-old student unsupervised access and control of a deadly, malfunctioning handgun.

101. The degree of harm that each of the defendants foresaw, or should have foreseen, was extraordinarily great—death, or serious bodily injury.

102. Each of the defendants could have easily fulfilled his duty to Tucker by preventing him from having access to the weapon and by following and enforcing the guidelines suggested by SRO Richan, and any burden associated with fulfilling the defendants' respective duties were

14

minimal, especially in contrast to the harm that could have resulted—and did, in fact, result—from their failures to fulfill their duties.

103. As a consequence of these circumstances, each of the defendants had a custodial duty to protect Tucker from harm.

104. Each of the defendants breached this duty to Tucker by, among other things, allowing Tucker unsupervised access to a dangerous weapon and failing to give Tucker any instruction or training with respect to the weapon.

105. As the direct and proximate result of Defendants' conduct, Tucker was killed, and the Thayers have suffered damages for which they are entitled to recover.

### THIRD CAUSE OF ACTION
*Negligence—Against All Defendants*

106. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

107. Defendants each owed a duty to the Thayers, and to Tucker, to protect Tucker from physical harm and to keep him from possessing dangerous weapons contrary to state law, among other duties.

108. Specifically, but without limitation, Defendants had duties *in loco parentis* over Tucker, to protect him even as his parents would have done had he been under their control and supervision and as a result of their creation of the danger to Tucker by providing him with a dangerous handgun in violation of state law and school policy.

109. By giving Tucker access to a dangerous handgun, without supervision, without training, and in violation of state law and school policy, and by failing to protect Tucker from the danger that they created, Defendants each violated their duties.

110. By creating rules, guidelines, and conditions for allowing the presence and use of a dangerous handgun on school premises, but failing to enforce such rules, conditions, or guidelines, follow-up to determine whether or not the rules, guidelines, and conditions were being implemented, or investigate the actual circumstances surrounding the presence and use of the handgun as practiced, Defendants breached their duties to Tucker and to the Thayers.

111. As the direct and proximate result of Defendants' conduct, Tucker was shot and killed, and the Thayers have suffered damages for which they are entitled to recover.

## FOURTH CAUSE OF ACTION
### *Gross Negligence—Against All Defendants*

112. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

113. Defendants failed to observe even slight care with respect to the duties that they owed to Tucker and to the Thayers to keep Tucker safe from harm, to follow state law and school policies, and to prevent Tucker from having access to, and use of, a dangerous handgun.

114. The conduct of each of the defendants shows carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.

115. Indeed, as the direct and proximate result of Defendants' careless and reckless conduct, Tucker was killed, and the Thayers have suffered damages for which they are entitled to recover.

## FIFTH CAUSE OF ACTION
### *Negligent Supervision—Against Defendants District, St. George, Mr. Goulding, and SRO Richan*

116. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

117. Defendants District has a duty to supervise its employees and agents, including, without limitation, Mr. Goulding and Mr. Eaton, to ensure that state laws and school policies and rules were enforced and properly implemented, to ensure that its employees were not themselves violating state laws and school policies by giving unsupervised control of a dangerous handgun to students, and to ensure that Tucker was not injured by the danger to him that Defendants created. Mr. Goulding, by virtue of his supervisory capacity on behalf of Defendant District, shares these duties with Defendant District.

118. In addition, Defendant District owed the Thayers a duty to supervise their son, Tucker, while he was on school premises for a school-sponsored activity, to protect Tucker from danger and harm in the manner that the Thayers would have had they been in a position to protect Tucker, as was the District and its employees.

119. Defendant St. George has a duty to supervise its employees and agents, including, without limitation, SRO Richan and any other employees, officers, or agents of SGPD, to ensure that state laws and department rules related to the presence of dangerous firearms on school campuses were enforced and properly implemented. SRO Richan, as the school resource officer assigned to Desert Hills and as the officer who created and promulgated rules related to the presence of the dangerous firearm at Desert Hills, shared these duties with Defendant District.

120. Without limitation, Defendants District and St. George, through SGPD, violated their duties to supervise their employees and agents when they ignored state laws prohibiting minors from using handguns and barring handguns from school premises, when they ignored district policies related to the presence of weapons on school grounds, when they ignored specialized rules and procedures created specifically for the use of the weapon in the production

17

of "Oklahoma" at Desert Hills, and when they allowed Tucker to have unsupervised access and use of the dangerous weapon.

121. As the direct and proximate result of the above-named Defendants' careless and reckless conduct, Tucker was shot and killed, and the Thayers have suffered damages for which they are entitled to recover.

### SIXTH CAUSE OF ACTION
*Negligent Failure to Train—Against Defendants District and St. George*

122. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

123. Defendants District and St. George, through SGPD, each had a duty to train their agents and employees, including Mr. Goulding, Mr. Eaton, and SRO Richan, with respect to state law and school policy regarding the presence of dangerous handguns on school property and in the possession of minors.

124. Moreover, when Defendants District and St. George, through SGPD, chose to introduce the dangerous gun onto school premises, where the gun would be in close proximity with students, Defendants District and St. George, through SGPD, had a duty to instruct those students, including Tucker, on the same laws and policies.

125. Moreover, Defendants District and St. George, through SGPD, should have provided adequate training with respect to the danger and appropriate use of handguns in general, and specifically, the malfunctioning hair trigger weapon that was actually used when they allowed Tucker unsupervised access to the gun, or when they at least failed to prevent Tucker from having access to the handgun without adult supervision.

*//*

126. However, neither Defendant District nor Defendant St. George provided adequate training to their agents and employees, and no training at all was offered to the students who had access to the dangerous weapon.

127. As the direct and proximate result of the above-named Defendants' conduct, the Thayers have suffered damages for which they are entitled to recover.

## SEVENTH CAUSE OF ACTION
### Violation of Statute—Against Defendants District and Messrs. Goulding, Eaton, and Amodt

128. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

129. Utah law prohibits individuals from providing handguns to minors. *See* Utah Code Ann. § 76-10-509.5(1) (2009).

130. Tucker, as a minor child, was in the class of individuals that the legislature intended to protect when it passed the statute.

131. The above-named Defendants allowed Tucker to have unsupervised access to a dangerous handgun, provided the handgun for Tucker's use, and encouraged his use of the handgun.

132. Defendants' violation of the state statute constitutes prima facie evidence of negligence.

## EIGHTH CAUSE OF ACTION
### Negligent Entrustment—Against Defendants District and Messrs. Goulding, Eaton, and Amodt

133. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

134. The above-named Defendants each owed the Thayers and Tucker a duty not to give or lend a dangerous handgun in violation of an applicable statute, ordinance, or school policy.

135. The above-named Defendants each owed the Thayers and Tucker a duty not to entrust the firearm to a fifteen-year-old child.

136. The above-named Defendants each owed the Thayers and Tucker a duty to be aware of the handgun and those who may gain access to the handgun after entrusting it to another.

137. The above-named Defendants each owed the Thayers and Tucker a duty to train and/or supervise the individual to whom the handgun was entrusted.

138. The above-named Defendants each owed the Thayers and Tucker a duty to advise the individual to whom they entrusted the handgun of any unusual characteristics of the weapon.

139. The above-named Defendants each owed the Thayers and Tucker a duty to retake possession of the handgun upon observing signs of misuse.

140. Each defendant breached each of these duties by, without limitation: entrusting the handgun to Tucker in violation of state law and school policy; entrusting the handgun to Tucker despite the fact that he was a minor with absolutely no experience or knowledge related to handguns or to blank rounds; failing to supervise Tucker while he was in possession of the handgun; failing to provide Tucker with any training to protect himself from the dangerous handgun and the blank rounds; failing to advise Tucker that the handgun had been modified in such a way that it had a dangerous "hair trigger"; and failing to ensure that the handgun was used properly after seeing evidence of its misuse.

//

141. Tucker was incompetent to use a handgun and was young and inexperienced with handguns and with blank rounds.

142. The above-named Defendants each knew or had reason to know, because of Tucker's youth, inexperience, or otherwise, that Tucker may use the weapon in a manner involving unreasonable risk of physical harm to himself and others who each defendant should have expected to share in or be endangered by the use of the handgun.

143. Despite this knowledge, the above-named Defendants entrusted the dangerous weapon to Tucker.

144. By entrusting the handgun with Tucker, the above-named Defendants created an appreciable risk of harm to Tucker and others.

145. As the direct and proximate result of the above-named Defendants' conduct, Tucker was killed, and the Thayers have suffered damages for which they are entitled to recover.

## NINTH CAUSE OF ACTION
### Negligent Storage of Handgun—Against Defendants District and Messrs. Goulding, Eaton, and Amodt

146. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

147. The above-named Defendants each owed a duty to the Thayers and to Tucker to store the handgun and the ammunition in an appropriate manner to prevent their misuse.

148. The above-named Defendants each knew, or should have known, that Tucker was likely to use the handgun and the ammunition, contrary to state law prohibiting the use of handguns by minors, or to conduct himself in a manner as to create an unreasonable risk of harm to himself or to others.

149. The above-named Defendants' storage of the handgun under the soundboard without any adult supervision left the dangerous weapon in the possession and under the control of the individuals likely to use the weapon inappropriately and contrary to state law.

150. The above-named Defendants each could reasonably foresee Tucker's use of the handgun given his youth, his inexperience with handguns and blank ammunition, and the specific instances where Tucker had used the handgun during the rehearsals and performances of the production of "Oklahoma" with Defendants' knowledge and consent, contrary to state law prohibiting use of handguns by minors.

151. By storing the handgun in an inappropriate location, where Tucker could easily gain control and possession of the handgun and the ammunition, the above-named Defendants breached their duties to Tucker and to the Thayers.

152. As the direct and proximate result of the above-named Defendants' conduct, Tucker was shot and killed, and the Thayers have suffered damages for which they are entitled to recover.

## TENTH CAUSE OF ACTION
### *Respondeat Superior—Against Defendants District and St. George*

153. The Thayers reassert all other allegations of this Complaint and incorporate them herein as if set forth in full.

154. The employees and agents of Defendants District and St. George, through SGPD, including, without limitation, Mr. Goulding, Mr. Eaton, and SRO Richan, were engaged in conduct of a general kind and nature that each was employed to perform.

//

//

155. The conduct of the employees and agents of Defendants District and St. George, through SGPD, as complained of herein, was generally directed toward the accomplishment of their duties and in the scope of their authority for their employers.

156. The conduct of the employees and agents of Defendants District and St. George, through SGPD, as complained of herein, occurred within the hours of their work and within the ordinary spatial boundaries of their employment.

157. The conduct of the employees and agents of Defendants District and St. George, through SGPD, was motivated, at least in part, by the purpose of serving the interests of Defendants District and St. George.

158. Therefore, Defendants District and St. George should each be liable for the conduct of their employees and agents, as complained of herein, under the doctrine of respondeat superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ron and Cathie Thayer respectfully request that this Court enter judgment against each defendant as follows:

A. For general compensatory damages in a reasonable amount to be determined by the trier of fact.

B. For special, consequential, and incidental damages in a reasonable amount to be determined by the trier of fact.

C. For punitive and exemplary damages in a reasonable amount to be determined by the trier of fact based upon each defendant's willful and malicious or intentionally

//

fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward and a disregard of, the rights of others, as may be allowed by law.

D.  For prejudgment interest on the damages assessed by the verdict as may be allowed by law.

E.  For Plaintiffs' costs and reasonable attorney fees incurred herein as may be allowed by law, including 42 U.S.C. § 1988(b) (2009).

F.  For any further relief that this Court may deem just and equitable under the circumstances.

DATED this __25th__ day of June, 2009.

GALLIAN, WILCOX,
WELKER, OLSON & BECKSTROM, L.C.

Jeffrey C. Wilcox
John L. Collins

*Attorneys for Plaintiffs*