IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| RON THAYER and CATHIE THAYER,<br><br>Plaintiffs,<br><br><br><br>vs.<br><br><br>WASHINGTON COUNTY SCHOOL DISTRICT, CITY OF ST. GEORGE, ROBERT GOULDING, MICHAEL EATON, STACY RICHAN, DAVID AMODT, JOHN and JANE DOES I-X, ABC CORPORATIONS I-X, and XYZ PARTNERSHIPS I-X,<br><br>Defendants. | MEMORANDUM OPINION<br>AND ORDER<br><br><br><br><br>Case No. 2:09-CV-565<br>Judge Dee Benson |

Before the court is defendant Stacy Richan's motion for summary judgment on plaintiff's

First Amended Complaint.

## **BACKGROUND FACTS**

Consistent with Rule 56 of the Federal Rules of Civil Procedure, the following facts,

where controverted, are described in the light most favorable to the non-moving parties.

In the fall of 2008, the drama department at Desert Hills High School in St. George,

Utah, decided to put on the play "Oklahoma."  The school's drama coach, Michael Eaton, was in

charge of the production.  The play has a scene where a gun is fired.  Wanting the sound effects to be as realistic as possible, Mr. Eaton sought permission from the school administration to use a gun that fired blanks.[1]  (Dkt. Nos. 117 and 118; M. Eaton Dep. at 15.)  In seeking permission, Mr. Eaton spoke with Officer Stacy Richan, a police officer with the St. George Police Department, who was on assignment to Desert Hills High School as its special resource officer. Mr. Eaton asked Officer Richan what the rules would be if they were allowed to use such a gun in the play.  In response, Officer Richan recommended the following:

> - adult supervision;
>
> - only a parent would be allowed to bring the gun to school;
>
> - only a parent would be allowed to handle the gun;
>
> - the parent would bring the gun in a locked box that no one else had access to;
>
> - only the parent would shoot the gun; and
>
> - the parent would leave with the gun.

(Richan Dep. at 21-23.)

At some point[2] these rules were presented to and discussed with the school's vice principal, Robert Goulding, who was the top official at the school while the principal was absent. Mr. Goulding agreed that a gun that fired blanks could be used on the condition that the rules

---

[1] Pursuant to Utah State law, firearms are generally prohibited on high school property. Utah Code Ann. § 76-10-505.5(1).

[2] The record evidence – notably the deposition testimony of Officer Richan, Vice Principal Goulding and Mr. Eaton – reflects some variance as to precisely the order in which these various conversations took place, but the fact that the conversations took place in late October or early November 2008, and the fact that the rules were discussed and understood by each of the 3 persons involved (Eaton, Richan and Goulding) are not in dispute.

recommended by Officer Richan were followed.  (Richan Dep. at 48.)

A student, Sara Amodt, was the stage manager for the play.  Her father, David Amodt, owned a .38 caliber revolver.  Arrangements were made to use this gun in the play, with all of Officer Richan's rules applicable to it.  Mr. Amodt agreed to be the person who would bring the gun to school in a locked container and that he would be the only person to possess and fire it.

After these arrangements were made, Mr. Goulding and Officer Richan believed it was Mr. Eaton's primary responsibility to make sure the rules were followed.  (M. Eaton Dep. at 28-29; S. Amodt Dep. at 29.)

Thereafter, Mr. Amodt regularly brought the gun to the play's rehearsals.  At some point, however, in disregard of the rules, he allowed Tucker Thayer, a 16-year-old sophomore, to shoot the gun during rehearsals.  (D. Amodt Dep. at 43.)  Tucker was running some of the lights in the sound booth for the production.  The sound booth was also the location where the gun was shot during the play.

Tucker had some previous experience with firearms.  He had received boy scout merit badges for .22 rifle and shotgun shooting and in the summer preceding the 2008 school year he had worked as an assistant on a shotgun range at a summer camp.  ®. Thayer Dep. at 20-21, 32-33.)

Tucker knew the combination to Mr. Amodt's gun box.  In addition to Mr. Amodt, at least Sara Amodt and Mr. Eaton knew that Tucker was being permitted to handle and fire the gun during rehearsals.  (S. Amodt Dep. at 45.)  Mr. Eaton testified that on one occasion when the gun was fired during a rehearsal he was so pleased with the sound effect that he said to Sara,

"tell your dad he's my new best friend." (M. Eaton Dep. at 49.)  Sara informed him it was Tucker who had fired the gun.  Mr. Eaton then said, "tell Tucker he's my new favorite student." (Id.)

The November 5, 2008 Incident

On November 5, 2008, after Mr. Amodt had begun bringing the gun to school and attending play rehearsals, he was unable to get to the rehearsal on time.  He had business to attend to in another city, and he would not be able to be there for the start of the rehearsal.  He asked his wife, Misty Amodt, to take the gun to school.  (M. Amodt Dep. at 83-84.)

Mrs. Amodt, apparently concerned about making sure appropriate rules were followed, telephoned Vice Principal Goulding, to inform him that she had been asked by her husband to bring the gun to the rehearsal.  She asked what she needed to do to avoid any problems.  Mr. Goulding said it would be okay for her to bring the gun to school in place of her husband. (Goulding Dep. at 23.)

After speaking with Mr. Goulding, Mrs. Amodt put the gun into the locked case and put the case inside Sara's backpack.  Then she and Sarah drove to the school.  When they were in the front foyer of the school, they had a chance encounter with Officer Richan.  Mrs. Amodt's deposition testimony about this encounter is as follows:

> Mrs. Amodt:   I said, I'm Mrs. Amodt and this is my daughter Sara.  I'm here for the play rehearsal.  And my question to you is, do I need to stay?  I told him that my husband was on a service call in Springdale and that he would not make it to the school for at least another hour, and so my question was, did I need to stay with the gun?
>
> Question:      Okay.  What was his response?

4

Mrs. Amodt:   He, in my opinion, was in a hurry to get out to bus duty, and his response was rather abrupt.  He told me that Mr. Eaton knew the rules and that it was fine.  And I then replied, so do I need to stay?  And he said, no.  Mr. Eaton knows the rules.  And so he walked out to bus duty.  I walked out immediately after him.  He stood out in front of the school with another gentleman, and I told him good-bye and he told me good-bye.

. . . .

Question:   You've indicated that Officer Richan's response was to tell you that Mr. Eaton knew the rules.

Mrs. Amodt:   Yes.

(M. Amodt Dep. at 35.)

Sara Amodt then walked 100 yards to the auditorium with the gun in her backpack.

Thereafter there is nothing in the record before the court describing what transpired at the November 5, 2008 rehearsal.  However, it appears undisputed that nothing of consequence to this litigation occurred during this rehearsal.

The November 15, 2008 Incident

On November 15, 2008, Sara arrived at the sound and light booth at approximately 5:30 p.m. and left her backpack, containing the locked box with the gun inside, in the booth.  (S. Amodt Dep. at 88.)  Sara had forgotten the blanks for the gun, and so telephoned her mother and asked her to bring the blanks and leave them on the counter in the booth.  (Id.)

Around the same time, Mr. Amodt went up to the booth to find Sara.  She wasn't there, so Mr. Amodt went backstage to show cast members some pictures he had previously taken of the production.  (D. Amodt Dep. at 73.)  While he was showing the pictures, he assumed that the gun was in the locked case in the booth, and he knew that Tucker knew the combination to the case.  (Id.)

5

Upon leaving the booth, Sara had gone backstage to help girls get dressed for the play. (S. Amodt Dep. at 89.)  After completing that task, she started heading back to the booth when she was stopped in the hall and told not to go to the booth because something had happened to Tucker.  (Id. at 90.)  Tragically, Tucker died later that night from injuries sustained after he shot himself in the temple with a blank from the .38 caliber revolver.  (Dkt. No. 117, ¶¶ 68-76.)

## DISCUSSION

## I.     The Plaintiffs' Case Against Officer Richan

The plaintiffs' case against Officer Richan is brought pursuant to 42 U.S.C. § 1983 and rests on a "danger creation" theory which has been addressed in detail by the United States Court of Appeals for the Tenth Circuit in recent years.  Of the many Tenth Circuit opinions that have discussed this area of the law, perhaps the most comprehensive is Armijo v. Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir. 1998).  There, quoting liberally from its earlier opinion in Uhlrig v. Harder, 64 F.3d 567 (10th Cir. 1995), the court comprehensively explained the "danger creation" law, in pertinent part, as follows:

> "[S]tate officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm."  In Uhlrig, we held that "the danger creation theory must ultimately rest on the specifics of a substantive due process claim – i.e., a claim predicated on reckless or intentional injury – causing state action which 'shocks the conscience.'" In order to discern whether the facts of a particular case "shock the conscience" so as to support a substantive due process claim,
>
> we must bear in mind three basic principles highlighted by the Supreme Court . . . : (1) the need for restraint in defining [the] scope [of substantive due process claims]; (2) the concern that § 1983 liability not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

We held that to satisfy the "shock the conscience" standard, "the plaintiff must

6

demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." We declined to previously define this level of conduct, but left it to evolve over time. "We do know, however, that the 'shock the conscious' standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort . . . ."

. . . .

The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur.

Armijo v. Wagon Mound Public Schools, 159 F.3d 1253, 1262-63 (10th Cir. 1998) (footnotes and citations omitted).

From the foregoing discussion it is clear that the danger creation theory permits liability against a state actor only when there is either actual wrongful intent or recklessness that is sufficiently egregious to shock the conscience. See, e.g., Archuleta v. McShaw, 897 F.2d 495, 499 (10th Cir. 1990) ("Recklessness includes an element of deliberateness – a conscious, acceptance of a known, serious risk.")

## II.   **Review of Tenth Circuit Precedent**

The facts of Armijo and Uhlrig, and the results reached in those cases, are helpful in understanding the application of the danger creation doctrine in the instant case.

   A.   *Armijo v Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir. 1998)*

Armijo involved a 16-year-old learning disabled student, Philadelfio Armijo, at a public high school in New Mexico. Armijo had psychological and emotional problems, which included

7

impulsivity and depression.  He was a special education student.  In early October, 1994, Armijo

harassed an elementary student and was reprimanded for it by the school's principal, Mary

Schutz.  Armijo, 159 F.3d at 1256-57.  Upset by the reprimand, Armijo threatened physical harm

to the teacher who reported the incident, and to others.  The principal then immediately

suspended Armijo because she considered him to be a risk for physical violence at the school.

The principal instructed a school counselor (Tom Herrera) to drive Armijo home.  The

principal's actions violated school policy which generally prohibited sending a student home if

no parent was at the home.

Herrera dropped off Armijo at his home, where he was alone.  When his parents arrived

home later that day they found their son dead from a self-inflicted gunshot wound to the chest.

Id. at 1257.

Prior to the incident, Hererra, Principal Schutz, and a school aide named Pam Clouthier,

were aware of Armijo's depression and suicidal thoughts.  Earlier on the day Armijo died, after

the suspension incident, Clouthier had discussed the situation with Armijo, who was upset.  Ms.

Clouthier advised him to relax and that everything would be okay.  He responded by saying,

"maybe I'd be better off dead."  Id.

As in the instant case, Armijo's parents brought suit under § 1983 for a violation of their

son's substantive due process rights under a danger creation theory.  The defendants moved for

summary judgment, claiming that there was a lack of evidence to support the danger creation

claim.  The district court denied the motion against all three defendants, finding sufficient

evidence to present to a jury.  Id. at 1257-58.

The Tenth Circuit, following its explanation of the state of the danger creation doctrine as noted above, affirmed the district court as to Principal Schutz and Mr. Herrera, but reversed as to the school aide, Clouthier.

Regarding Principal Schutz and School Counselor Herrera, the Tenth Circuit stated as follows:

> The particular facts found in dispute by the district court, in conjunction with the evidence culled from our review of the record on issues not specifically addressed by the district court, were sufficient to raise factual inferences that could satisfy the five part test set forth in Uhlrig as to Individual Defendants Schutz and Herrera: (1) Armijo was a member of a limited and specifically definable group-special education students who have expressed threats of suicide, (2) Schutz' and Herrera's conduct put Armijo at substantial risk of serious, immediate and proximate harm by suspending him from school, which caused him to become distraught and to threaten violence, and then taking him to his home and leaving him alone with access to firearms, (3) they had some knowledge that might support an inference that Armijo was suicidal and distraught, was unable to care for himself, was home alone, and at least some of the Individual Defendants knew Armijo had access to firearms, (4) by taking this action, knowing of Armijo's vulnerability and risks of being left alone at home, Schutz and Herrera acted recklessly in conscious disregard of the risk of suicide, and (5) such conduct, if true, when viewed in total, possibly could be construed as conscious-shocking, depending on context as determined after a full trial.  In addition, these facts taken as true also could be construed to show (6) that Schutz and Herrera increased the risk of harm to Armijo. Thus, the district court properly denied summary judgment on this issue as to Schutz and Herrera.

Armijo, 159 F.3d at 1264 (footnotes omitted).

Regarding Clouthier, the Tenth Circuit said:

> However, we reverse the district court's order denying summary judgment as to Defendant Clouthier.  Clouthier was a school aide and there is nothing in the record to support a conclusion that Clouthier caused or created the danger that arguably led to Armijo's death.  There is nothing in this record to suggest that Clouthier was involved in the decision to suspend Armijo or to send him home alone without adult supervision.  In the absence of any evidence that Clouthier caused or created the danger, she was entitled to summary judgment.

Armijo, 159 F.3d at 1264 (citation omitted).

 B.  *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995)

 Uhlrig involved the death of Stephanie Uhlrig, who worked as a music and activity therapist at the Topeka State Hospital.  She was killed by a mental patient, Kenneth Waddell.  Years earlier, after he had been found not guilty by reason of insanity for aggravated battery, Waddell had initially been placed in the hospital's Adult Forensic Ward (AFW).  The AFW kept its patients secluded from the other units of the hospital because it contained high risk patients.  Uhlrig, 64 F.3d at 570-71.

 The AFW was later closed due to budgetary constraints and Waddell was moved to a regular unit of the hospital.  There he raped a female patient.  He was then transferred to another general population unit where Uhlrig worked as an activity therapist.  Id.

 Uhlrig was informed about Waddell's background and was also well informed of, and understood, the risks inherent in her job.  She stated to her supervisor that she had no problem escorting Waddell off grounds and working with him.  Later, Uhlrig and another therapist took Waddell and other patients to watch a movie away from the hospital.  When they returned to the hospital Waddell attacked and killed Uhlrig.  Her husband brought suit asserting, among other claims, a danger creation claim that his wife's substantive due process rights had been violated by the decision to close the AFW unit and transfer Waddell, a man with known violent tendencies, to the general population unit where Mrs. Uhlrig worked.  The suit was brought against various Kansas State officials including the Secretary of the Department of Social Services, the Commissioner of Mental Health, the Director of Mental Health Programs, and the

Superintendent of Topeka State Hospital, all of whom participated in the decision to close the

Adult Forensic Ward and place its residents in the general population units.  Id. at 571.

The district court granted the defendants' summary judgment motion, finding the

evidence insufficient to support liability under the danger creation theory.  Id.

On appeal, the Tenth Circuit framed the question, "Did defendants recklessly create a

special danger to Uhlrig that shocks the conscience?"  Id. at 574.  After a detailed examination of

what was then a 5-part test, the court found that there were genuine issues of fact as to part 1 of

the test (whether Uhlrig was a member of a specially definable group) and part 3 of the test

(whether the risk was known or obvious to these defendants).  But, as to the other 3 factors, the

court had no problem finding there were no triable issues of fact.  Id. at 576.

Regarding the fifth factor, identified by the court as the "shock the conscious" standard,

the court stated as follows:

> Finally, the fifth factor requires us to look at the conduct as a whole to determine whether
> it 'shocks the conscience.'  Here, none of the defendants intended to injure Uhlrig or any
> other hospital staff by the decision to close the AWL unit, nor were they indifferent to the
> risk that would be created by such action.  They established a procedure whereby trained
> professionals would make the actual assignments of the AWL patients. . . . [W]e have no
> difficulty concluding that Defendants did not engage in any conduct that was so
> egregious, outrageous and fraught with unreasonable risk so as to shock the conscience.

Uhlrig, 64 F.3d at 576.

Before applying Armijo's six-part test[3] to the instant case, it is helpful to reiterate what

the plaintiffs claim against Officer Richan.  As stated in their memorandum in opposition to the

---

[3]The 5-part test adopted in Uhlrig was expanded to a 6-part test in Armijo because of the
Supreme Court's decision in DeShaney v. Winnebago County Dept. of Social Services, 489 U.S.
189 (1989), which added the requirement that focused on whether the state had "created or
increased the individual's vulnerability to the danger in some way."  Id. at 201.

present motion, they contend two separate but related claims: (1) that Officer Richan "failed to take any action to ensure that the rules created for use of a handgun in the school play were actually implemented," and (2) "that he intentionally disregarded those rules when he allowed Sara Amodt, a minor child, to carry the gun in to school unsupervised."[4]  (Pls.' Mem. In Opposition at 2.)

These claims are based on the facts recited above.  While plaintiffs contend that there is a factual dispute about whether the rules recommended by Officer Richan were ever actually in place (Pls.' Mem. In Opposition at 18), the record does not provide any genuine support for this contention.  There is simply no dispute that the principal participants – Mr. Eaton, Mr. Goulding, Mr. Amodt, Mrs. Amodt, Sara Amodt, and Officer Richan – all knew that there were rules and that they were expected to be followed.  There is also no dispute that after the gun was actually taken to rehearsals and used in the play, the rules were not fully followed, as admitted by Mr. Eaton and Mr. Amodt.  Regardless of the violations of the rules by certain parties, however, the fact that there were rules that contemplated that the gun would never be in the hands of a student is not in genuine dispute.

Taking the facts in the light most favorable to the plaintiffs, the factual case against Officer Richan rests on the following:

- Sometime in late October or early November, 2008 Officer Richan, when approached about the possibility of using a blank-shooting gun in the school play, recommended that several rules should be followed if the gun were allowed to be

---

[4]Although it is not clear from either the First Amended Complaint or their memoranda, it is possible that the plaintiffs also claim that Officer Richan was responsible for the decision to allow the gun onto school property.  As explained elsewhere in this Memorandum Opinion this claim, if it is made, is not supported by any record evidence.

12

used (Richan Dep. at 21-23);

- These rules were that a parent would be the only one to bring the gun to the rehearsals, a parent would be the only one to handle the gun, a parent would bring the gun in a locked box so no one else had access to it, a parent would be the only one to discharge the gun for whatever reason during the play, a parent would be responsible for leaving with the gun, and, finally, that a responsible adult (Mr. Eaton) be responsible for seeing that these rules were followed (Richan Dep. at 21-23, 24); and

- On November 5, 2008, ten days before the incident that took Tucker Thayer's life, Officer Richan had a chance encounter with Mrs. Amodt in the school's foyer in which she told him she, rather than her husband, was bringing the gun to school. She asked Officer Richan if she needed to stay with the gun. Officer Richan responded by telling her, "Mr. Eaton knows the rules," and that it was okay for her to leave. Accordingly, she immediately left the school, and her daughter, Sara, with the gun in her backpack, walked to the play practice in the school auditorium. (M. Amodt Dep. at 35.)

Plaintiffs contend that these facts support a triable issue that meets all 6 parts of the Armijo test. Defendants concede, for purposes of this motion only, that part 2 is met, but contend that none of the other 5 parts are satisfied. With Armijo and Uhlrig in mind, we will now address each part in turn.

## III.   Application of the 6-Part Test

Part 1.   Did Officer Richan create the danger or increase Tucker Thayer's vulnerability to it?

If we accept the danger at issue as the risk associated with high school students being in the presence of a gun that shoots blanks, it can be argued in a very general sense that Officer Richan helped create the danger by not insisting that a gun should not be allowed on to school property under any conditions. But this contention has not been asserted by the plaintiffs, and would be overly broad and unsupported in any event. There is nothing in the record to show that

it was Officer Richan who authorized the use of the gun, or that he had the power or was given

the power by school officials to decide whether to allow the use of the gun in the play. Officer

Richan was undisputedly not in charge of the school. He was a special resource officer. The

facts show only that he made recommendations as to what rules should be implemented *if* the

drama department were allowed to use a gun to shoot blanks during the play. All of the evidence

the court has before it indicates that someone other than Officer Richan made the decision to

allow the use of a gun during the play.

Viewed in that light, there is merit to defendant's position that Officer Richan not only

did not create the danger, rather, his efforts were devoted to eliminating any danger that would

exist without his recommended rules.

As for the encounter with Mrs. Amodt, Officer Richan's behavior, taken in the light most

favorable to the plaintiffs' version of the events, could be construed to have increased Tucker

Thayer's vulnerability to the danger of being in the proximity of the gun. This is because he

permitted the gun to be transported solely by a student.

Similarly, Plaintiffs' assertion that Officer Richan failed to follow up on his own rules to

see if they were being followed, especially when coupled with the fact that they were not being

followed, also finds some support in the facts. Therefore, as to these latter two claims against

Officer Richan, the record supports a triable issue of fact whether Officer Richan increased

Tucker Thayer's vulnerability to the danger.

Part 2. It is conceded that Tucker Thayer was part of a limited and specifically defined

group. (Def.'s Mem. In Support at 24.)

Part 3.  Did Officer Richan's conduct put Tucker Thayer at substantial risk of serious,
immediate and proximate harm?

This question focuses on whether the risk is "substantial," and the harm is "immediate."
Neither of these qualifications are supported by the evidence in this case.  The plaintiffs argue
that "a jury could conclude that Richan created a serious danger that did not previously exist
when he allowed a gun that shot blanks onto school grounds and then failed to implement and
enforce the rules."  (Pls.' Mem. In Opposition at 21.)  But beyond this general statement, they
offer only the chance encounter with Mrs. Amodt in support of their assertion that Officer
Richan consciously put Tucker Thayer in harms way.  In one conclusory sentence they claim
Officer Richan's actions "exposed Tucker to a substantial and immediate risk of harm," (Pls.'
Mem. In Opposition at 22) yet they fail to adequately explain why.  They do not even address the
undisputed fact that Officer Richan, the architect of the rules, believed they were in place and
being followed, and even more importantly, believed they were being overseen by a responsible
adult, Mr. Eaton, the man in charge of the play.  With reference to the November 5 incident with
Mrs. Amodt, the plaintiffs assert that Officer Richan "would have to know that it [the gun]
would be fired during that rehearsal by a child because he had been told that Mr. Amodt, the
owner of the gun, was unable to be there that day."  (Pls.' Mem. In Opposition at 22.)  This is
pure speculation; and an unsupported leap of logic.  There is virtually nothing in the record to
support any inference that Officer Richan "knew" (or, for that matter, should have known) that
the gun would be fired by a child.

Plaintiffs' best evidence rests on the fact that Officer Richan knowingly relaxed his own

rules when he allowed the gun to be taken to the auditorium by someone other than an adult on

November 5, 2008.  But such action hardly supports a conscious (or reckless) act on his part

which he knew carried the risk of immediate harm.  Again, there is no dispute Officer Richan

believed the rules would be followed by Mr. Eaton.

The fact that nothing negative happened with the gun on November 5, 2008 provides

some additional indication that whatever additional risk was created by Officer Richan's actions

on that date was neither substantial nor immediate.

Part 4.  Was the risk known or obvious?

Consistent with the foregoing discussion regarding the nature of the harm, the evidence

offered by the plaintiffs is insufficient to support a finding that the risk was obvious or known to

Officer Richan.  The risk in question is that a student (or anyone else for that matter) may

become seriously injured by the improper discharge of a gun that shoots blanks.  Such a risk

could not be known or obvious to Officer Richan if he reasonably believed his recommended

rules were being followed.  There are no facts to show that Officer Richan knew that a student

was being allowed to use the gun.  The plaintiffs allege that he failed to followed up on the rules,

but even if that is true, it at best supports a claim of negligence, and could hardly support a claim

that to him the risk was obvious and known.

Part 5.  Did Officer Richan act recklessly in conscious disregard of that risk?

Recklessness in a danger creation context requires proof that Officer Richan "was aware

of a known or obvious risk that was so great that it was highly probable that serious harm would

follow," and that he nevertheless "proceeded in conscious and unreasonable disregard of the

16

consequences." Medina v. City and County of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992). There is virtually no factual support for such conscious disregard of a known risk by Officer Richan. To the contrary, he recommended rules to eliminate the risk, and he expected the rules would be followed. By those actions, Officer Richan was quite the opposite of a state actor who may be held accountable for reckless behavior under the danger creation theory.

One of the cases that is frequently used to illustrate the danger creation theory is Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989). There the plaintiff's case was based on an incident that involved a traffic stop at 2:30 in the morning in an area outside Tacoma, Washington. The car was driven by Robert Bell, who was stopped for driving with his high-beam lights on. Bell was intoxicated and placed under arrest. The car was impounded. The plaintiff, Ms. Wood, was a passenger in the car. According to her version of the facts, she asked the police officer how she would get home. He responded by saying he was sorry and that she had to get out of the car. She claims he then returned to his patrol car and drove away, leaving her to fend for herself in an area that had the highest crime rate in the county. It was 50 degrees outside and she was wearing only a blouse and jeans. Her home was 5 miles away. After walking one-half block, and after turning down offers of rides from 3 or 4 strangers, she accepted a ride from an unknown man who took her to a secluded area and raped her. Id. at 586.

The Ninth Circuit, after recognizing that mere negligence or lack of due care by state officials does not trigger the protections of the fourteenth amendment, held that the plaintiff had presented a triable case for a jury as to whether Trooper Ostrander acted with deliberate indifference as to Wood's interest in personal security. Id. at 588.

17

Plaintiff's version of the facts in <u>Wood</u> clearly presented a genuine issue as to whether the state actor acted recklessly in conscious disregard of a known risk.  The risk was that a woman left alone in a high crime area at 2:30 in the morning, wearing only a blouse and jeans, would be physically attacked.  The risk should have been obvious to the police officer.  He increased the woman's vulnerability to the danger and put her at risk of immediate harm.  If the facts were different, if, for example, the trooper rather than driving away with no regard for Wood's safety, had instead arranged for a ride for her, and had watched her get into a car with a responsible adult at the wheel, there would be no valid claim under the danger creation theory against the officer.  This would be true even if, thereafter, the driver of the car had assaulted Wood, because the officer's actions in securing a ride for her, rather than placing Wood in a known position of danger, would be seen as having taken affirmative steps to eliminate the risk.

The instant case is similar to this latter scenario.  Officer Richan, knowing a decision had been made to allow a gun to be in the vicinity of students, took reasonable steps to assure their safety and eliminate the danger.  His failure to follow up to see if the rules were being followed, especially without any knowledge that they weren't being followed, did not create a danger, and even if it did, certainly not a serious and immediate one.  Similarly, his behavior in allowing the gun to be taken into the auditorium by Sara could not be construed as culpable behavior by any reasonable jury.  Rather than showing conscious disregard of the risk the facts here tend to show the opposite; a conscious regard for the risk.

<u>Part 6.</u>  Does Officer Richan's conduct, viewed in total, shock the conscience?

The answer is "no," for all of the foregoing reasons.  It bears repeating the "three basic

18

principles" highlighted by the United States Supreme Court and emphasized by the Tenth Circuit in <u>Uhlrig</u>: (1) the need for restraint in defining the scope of the substantive due process clause, (2) the concern that § 1983 liability not replace state tort law, and (3) the need for deference to local policy making bodies.  <u>Uhlrig</u>, 64 F.3d at 573.

The shock the conscience standard exists so that these principles will be followed.  It requires a "high level of outrageousness" and a "magnitude of harm that is truly conscious shocking."  <u>Armijo</u>, 159 F.3d at 1262.  This is not an easy standard to meet.  The state actor must knowingly "place an individual in a position of danger, effectively stripping a person of her ability to defend herself . . . ."  <u>Id.</u> at 1263.  And, it requires "culpable knowledge," which is satisfied by a showing of actual wrongful intent or a level of recklessness that exceeds mere negligence or gross negligence.  Viewed against such a demanding standard, Officer Richan's alleged behavior falls short.

### CONCLUSION

Viewed in the totality of the circumstances, plaintiffs' claims against Officer Richan are inadequate to support their § 1983 action against him.  In certain respects, Officer Richan's behavior is similar to the behavior of the school aide, Pam Clouthier, in <u>Armijo</u>, who was found entitled to summary judgment.  Neither of them made the actual decision to create the danger in question.  Officer Richan recommended rules for the gun, but the decision to allow the gun onto school property was made by others.  In other respects, Officer Richan resembles the state officials in <u>Uhlrig</u>.  They, like Officer Richan, while recognizing a potentially dangerous situation, implemented procedures to attempt to eliminate or at least lessen the risks.  Such

action was deemed insufficient in <u>Uhlrig</u> to support a § 1983 action, falling short of the kind of

outrageous action that truly shocks the conscience.  The same is true of Officer Richan's conduct

in this case.  Officer Richan's Motion for Summary Judgment is GRANTED WITH

PREJUDICE.

      DATED this 2nd day of February, 2012.

Dee Benson
United States District Judge